**AFL–CIO, et al., Plaintiffs,**

v.

**William BROCK, et al., Defendants.**

**Civ. A. No. 87–1683.**

United States District Court, District of Columbia.

Aug. 5, 1987.

---

Shelley Davis, Edward J. Tuddenham, Migrant Legal Action Program, David M. Silverman, Assoc. Gen. Counsel, AFL–CIO, Washington, D.C., Garry G. Geffert, West Virginia Legal Services Plan, Inc., Martinsburg, W.Va., for plaintiffs.

Drake Cutini, Dept. of Justice, Harry L. Sheinfeld, Robert J. Lesnick, Dept. of Labor, Washington, D.C., for defendants.

Carl W. Vogt, Warren Belmar, John M. Simpson, Robert A. Burgoyne, Fulbright & Jaworski, Washington, D.C. intervenor for Nat. Council of Agr. Employers, et al.

## MEMORANDUM

SPORKIN, District Judge.

By this action plaintiffs challenge regulations promulgated by the United States Department of Labor ("DOL" or "the Department") concerning the employment of nonimmigrant alien workers in the United States. The Secretary of Labor regulates the wages and working conditions of these alien laborers. Thus, before an employer can hire alien workers, it must agree to comply with DOL regulations and it must receive the appropriate "certification" from the Department of Labor. However, the Secretary of Labor is prohibited by law from certifying the importation of nonimmigrant alien workers unless "the employment of the alien ... will not adversely affect the wages and working conditions of workers in the United States similarly employed." 8 U.S.C. § 1186(a)(1)(B). Historically, the Secretary fulfilled this mandate by establishing an "adverse effect wage rate" ("AEWR") in areas where wages were depressed by the importation of aliens. The AEWR was set above the prevailing wage rate in the area and employers were required to pay the higher rate.[1]

Purportedly responding to the passage of the Immigration Reform and Control Act of 1986 ("IRCA"), Pub.L. No. 99–603, 100 Stat. 3411, (1987), codified at 8 U.S.C. § 1101 et seq., the Secretary promulgated new AEWR regulations effective June 1, 1987, which essentially reduce the AEWR to prevailing wage rates by setting it equal to the "annual weighted average hourly wage rate ..." 20 C.F.R. § 655.107, 52 Fed.Reg. 20521, (June 1, 1987).

Plaintiffs allege that these regulations establishing a new methodology for setting the AEWR are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, and they seek to enjoin their implementation. Because I find that the regulations do not comply with the law requiring that the Secretary ensure "employment of the alien ... will not adversely affect the wages and working conditions of workers in the United States similarly situated," 8 U.S.C. § 1186(a)(1)(B),

---

1. Similarly, for workers who were paid on a piece-rate basis, the Department required that the piece-rate be designed to yield an hourly wage commensurate with the AEWR. See, e.g., 20 C.F.R. § 655.202(b)(9), (April 1, 1986).

I grant the plaintiffs' motion and enjoin the implementation of the regulations.[2]

## I. BACKGROUND

### A. Authority

Before IRCA, under the Immigration and Nationality Act of 1952 ("INA"), Pub.L. No. 414, 66 Stat. 166, *as amended,* 8 U.S.C. § 1101 *et seq.,* the decision to grant or deny a nonimmigration visa petition was solely within the authority of the Attorney General, 8 U.S.C. § 1101(a)(15)(H)(ii), § 1184 (1986), who in turn delegated the authority to the Immigration and Naturalization Service ("INS"). 8 C.F.R. 214.2(h)(3). It was INS's policy, however, as manifested in regulations implementing the Act, to require that the Department of Labor advise INS with respect to, among others, the following two issues:

(a) Whether there are a sufficient number of able, willing, and qualified U.S. workers available to do the work proposed to be done by the alien; and

(b) Whether the employment of the alien will adversely effect the wages and working conditions of similarly employed U.S. workers.

*See, e.g.,* 20 C.F.R. § 655 (January 16, 1981) *implementing* 8 C.F.R. § 214.2(h)(3)(i). Thus, under the old regulations, INS demanded that an employer who wanted to import aliens must first seek certification on these two issues from the Department of Labor.

IRCA changed the Department of Labor's AEWR authority by codifying what had been a regulatory mandate.[3] Now, instead of acting in an advisory capacity to the INS, the Department of Labor has specific authority to certify alien workers granted by the statute itself. 8 U.S.C. § 1186. The words of the new statute closely parallel what had been the regulatory language developed by INS under the old law. Thus, the law (itself) now requires that before the Attorney General approve a petition for importation of alien workers, the employer desiring to import aliens must seek certification from the Secretary of Labor that:

(A) there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition, and

(B) the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed.

---

**2.** Plaintiffs attack both the new methodology for establishing an AEWR, and the new piece-rate regulations. Because the government would not consent to continuing an agreed upon bridge order beyond the hearing on the plaintiffs' motion for an injunction, I have been forced to decide the AEWR issue on a very expedited basis. The hearing on July 31, 1987, due to these time pressures, was limited to the AEWR issue. Thus I have not considered all of the plaintiffs' objections to the piece-rate regulations. However, it is obvious to me that because the piece-rate regulation in question is tied to the "appropriate hourly rate," *see* 20 C.F.R. § 655.102(b)(9)(ii)(A), 52 Fed.Reg. 20515, and because that appropriate hourly rate could be the AEWR, *see* 20 C.F.R. § 655.102(b)(9)(i), 52 Fed.Reg. 20515, the piece-rate regulation should not be effectuated at least until new AEWR regulations are properly established. Accordingly, I also enter an Order with respect to the piece-rate regulations. While the government considers and promulgates new AEWR regulations, I will consider and rule on the plaintiffs' objections to the new piece-rate regulations. To the extent any party wishes to be heard on the issue, it can request that a hearing date be set.

**3.** In its brief, one of the intervenors notes that the responsibilities of DOL set forth in the prior regulations and codified by IRCA actually appeared in substantially similar form in the INA at 8 U.S.C. § 1182(a)(14). Memorandum of Intervenor-Defendants National Council of Agricultural Employers, *et al.* on the Merits at 9. While this is true, the mandate to the Department that is part of the INA pertains to aliens seeking permanent admission to the United States and therefore that statutory provision had no application to the H–2 program. Thus, the inclusion of 8 U.S.C. § 1186 in IRCA *does* codify the previous H–2 regulations and does make these regulations statutory responsibilities with respect to the H–2A program. *See* 52 Fed. Reg. 20504 (June 1, 1987) ("In passing IRCA, Congress incorporated into statutory law the longstanding regulatory requirement ...); Memorandum in Support of Federal Defendants' Motion to Dismiss ("Fed.Def.Br.") at 5 ("In codifying this previously regulatory program ...")

8 U.S.C. § 1186(a)(1).[4]

### B. Adverse Effect Wage Rate

As the Department worked to fulfill its regulatory mandate—that is, to ensure that importation of alien workers would not adversely effect wages of American workers—it "found for many years that the presence of alien workers in agriculture depresse[d] the wages of similarly employed U.S. workers." 52 Fed.Reg. 20502 (June 1, 1987).[5] Fearing that widespread wage deflation might result from mass importation of alien workers, the Department protected the wages of U.S. workers through the promulgation of an enhanced minimum wage known as the "adverse effect wage rate." Employers seeking certification from the Department to import alien workers had to agree to pay this enhanced wage both to the American workers they might hire and to the alien worker.

Thus the AEWR became the specific mechanism by which the Department fulfilled its mandate to protect U.S. workers. Indeed, in the regulations at issue here, the Department describes the purpose of the AEWR in the exact language of the statutory provision requiring it to protect U.S. workers. *Compare* 52 Fed.Reg. 20502 ("The purpose of the AEWR is to ensure that the wages of similarly employed U.S. workers will not be adversely affected by the importation of alien workers.") *with* 8

U.S.C. § 1186(a)(1) (the Department must certify that "employment of the alien ... will not adversely affect the wages and working conditions of workers in the United States similarly employed.").

Though the concept of an AEWR dates back as far as the early 1950s, 52 Fed.Reg. 20503 (June 1, 1987), DOL first established AEWRs for 28 states in 1964.[6] 24 Fed. Reg. 19101 (1964), Pl.Ex. 5. "The formula for determining these rates used the 1950 Census of Agriculture average hourly wage rate for each State adjusted by the 1950–1963 trend in manufacturing wages ... These changes had the effect of generally raising the AEWR for each State above the average agricultural wage ..." DOL Assessment, Appendix to Pl.Ex. 6 at 2. Beginning in 1968, the Department began calculating AEWRs by using the 1964 AEWR as a base and by increasing it annually "by the same percentage change in the Statewide annual average wage rates for field and livestock workers, as surveyed by the United States Department of Agriculture (USDA)." 52 Fed.Reg. 20503 (June 1, 1987).[7] This traditional methodology produced AEWRs which were approximately 20% above the average farm wage in the states for which they were published. *See* Draft H–2A Regulations (March 13, 1987) ("Draft Regulations"), Plaintiff's Exhibit 7 at 31–32.[8]

---

**4.** Under the old law, the visas, if ultimately issued, were to "aliens" as defined at 8 U.S.C. § 1101(a)(15)*(H)(ii),* and thus they were known as H–2 visas; the program was known as the H–2 program. Under IRCA, the visas, if ultimately issued, are to "aliens" as defined at 8 U.S.C. § 1101(a)(15)(H)(ii)(A), and thus they are known as H–2A visas; the program is known as the H–2A program. *See* 8 U.S.C. § 1186 ("Admission of temporary H–2A workers), § 1186(i)(2).

**5.** The history of the AEWR is documented in the regulations at issue. 52 Fed.Reg. 20502–20505 (June 1, 1987). *See generally,* Department of Labor, *Adverse Effect Wage Rates: An Assessment of the Current Methodology,* (DOL Draft Dec. 29, 1986) ("DOL Assessment"), Plaintiffs' Exhibits in Support of Motion for Temporary Restraining Order and Preliminary Injunction ("Pl.Ex.") 6.

**6.** The Department published so-called AEWRs on a state by state basis for 48 states in 1969 and 1970. 34 Fed.Reg. 17770 (1969); 35 Fed.Reg.

12393 (1970). Since then, the Department has published AEWRs only in those states where alien labor is certified ("user-states") and where, therefore, depressed wages are found. The new regulations at issue in this case proposed setting so-called AEWRs for 49 states, on a state by state basis, regardless of the presence of depressed wage rates.

**7.** From 1982 through 1985 USDA stopped publishing its farm wage survey. During this period, DOL used the same base rate and indexing methodology for setting the AEWR, but substituted ES–202 unemployment compensation data for the USDA data to calculate the annual percentage increase in the AEWR. *See Shoreham Co-op Apple Producers v. Donovan,* 764 F.2d 135 (2d Cir.1985).

**8.** Although this document was not included in the Administrative Record submitted to the Court by the federal defendants, numerous references to it do appear in that Administrative Record ("A.R."). For instance, Tab H at 19 is

Thus, as recently as March 13, 1987, in the draft regulations which preceded those at issue in this case, the Department proposed to determine AEWRs by simply "add[ing] a 20% differential to the USDA data," *Id.* at 28, meaning that "the AEWR for covered employment in each State would be 20% above the previous year's annual average hourly wage rates for field and livestock workers (combined) for the USDA wage survey region in which the State is located." *Id.* The rationale for the "20 percent 'differential' " as explained in the March 13 draft and as understood for decades prior to that, was twofold. *Id.* at 31. *First,* the bonus compensated for past adverse effects of the importation of foreign workers, *id.,* which, although difficult to measure, was "widely recognized [to have] occurred." *Id. Second,* "[i]n addition to compensating for past adverse effect, a differential also compensates for a lag in the availability of USDA average hourly wage data, on the assumption that wage rates generally tend to go upward over time." *Id.*

Despite these findings, when the interim final rule was issued in the June 1, 1987 Federal Register, there was absolutely no mention of a 20% differential. The language quoted in the last paragraph acknowledging that the traditional AEWR methodology tended to yield AEWRs 20% above average wages was absent from the final regulations; and instead of proposing to add a 20% differential to the USDA figures, the Department simply set the AEWR at the USDA average wage figure without any upward adjustment. *See* 20 C.F.R. § 655.107, 52 Fed.Reg. 20521 (June 1, 1987) (AEWR shall be "equal to the annual weighted average hourly wage rate ... as published annually by the U.S. Department of Agriculture ..."). Additionally, the Department did not adopt any replacement measures to ensure that the importation of aliens would not adversely affect U.S. workers. Thus, under the new

regulations, to obtain a certification, a grower need only agree to pay the higher of the average wage (which has been designated the AEWR), the prevailing wage, or the federal or state minimum wage. 20 C.F.R. § 102(b)(9)(i), 52 Fed.Reg. 20515.

## II. REVIEW

My review of the regulations in question is governed by the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.,* which requires the plaintiffs to show that the agency's action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Defendants raise three threshold issues: *first,* that there is no case or controversy present; *second,* that the case is not ripe for adjudication, and *third,* that the Secretary's determination of the AEWR is a nonreviewable, discretionary decision.

### A. Case or Controversy

██ Defendants allege that the plaintiffs' harm is entirely speculative, and thus this Court does not have jurisdiction because there is no case or controversy as required by Article III of the United States Constitution. I find this argument unpersuasive. The Supreme Court has set forth a simple three-part test for determining whether a plaintiff has shown the existence of a case or controversy within the meaning of Article III. *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). According to that test, the plaintiff must allege: "(1) an 'injury in fact' to his own interest, that (2) is 'fairly traceable' to the defendant's conduct, and that (3) is sufficiently likely to be redressed in a tangible way by available judicial relief." *Common Cause v. Department of Energy,*

the summary of an April 16, 1987 meeting between staff members of DOL and representatives of the intervenor National Council of Agricultural Employers. According to this summary, "AEWR methodology proposed in the draft is unacceptable ..." A.R. Tab H at 19. More-

over, as the cover page of the document reveals, it was sent to "Selected Congressional Staff" on March 20, 1987, as background for a DOL briefing of these staff members on March 23, 1987. Accordingly, I find that the draft regulations are properly before me.

702 F.2d 245, 250 (D.C.Cir.1983) (citation omitted).

■ The plaintiffs have documented an "injury in fact." In general terms, this harm is that, "DOL's new H–2A wage regulations allow foreign workers to be imported at depressed wage rates and that the employment of cheap foreign labor will further depress U.S. workers' wages and deprive them of needed job opportunities. The loss of American jobs and income as a result of unfair foreign competition is exactly the kind of injury-in-fact contemplated by the Article III requirement." Pl. Memorandum on the Merits ("Pl.Br.") at 34–35 (citations omitted).

More specifically, in their complaint, plaintiffs show, for example, that apple growers in West Virginia, Virginia, New York and New England traditionally import large numbers of temporary foreign workers for their fall harvest. Complaint at ¶ 42. According to H–2A regulations, applications for these workers must be filed with the Department at least 60 days before the harvest begins. *Id.* at ¶ 43. Thus, sometime this summer, these growers will be filing H–2A applications offering employment at adversely affected wage rates. *Id.* Although the Department has seven days to approve or disapprove of these offers, 8 U.S.C. § 1186(c)(2)(A), recruitment of American workers can begin immediately upon filing of the H–2A application. Complaint at ¶ 45. Therefore, in the very near future "plaintiffs and other U.S. workers must accept work at the adversely affected wage rates authorized by the new DOL wage regulations or they will forfeit these job opportunities to temporary foreign workers." *Id.* at ¶ 46. Even if they turn down these jobs, American workers will be immediately injured by the wage deflation that will result if employers can begin importing workers at these depressed wage rates. *Id.* at ¶ 47.

Plaintiff's documented injury is a direct result of the adverse action of the defendants (promulgating regulations which do not protect American workers) and this injury can be redressed through a favorable decision of this Court (striking down the regulations and ordering that new ones be issued). Accordingly, I find there is a case or controversy.

**B. Ripeness**

■ The defendants' second objection to review at this time is that the case is not ripe for adjudication. They point to the language of the statutory provision at issue which directs the Department to ensure that employment of aliens "will not adversely affect the wages ..." 8 U.S.C. § 1186(a)(1)(B). Their argument is that because Congress used the words "will not," IRCA "speaks only in terms of the effects of the future use of H–2A workers on U.S. workers; it does not provide that wage rates under the H–2A program are to be designed to eliminate supposed past 'wage depression.'" Fed.Def.Br. at 9.

This argument is without merit. It ignores Congressional intent and it turns this important Congressional enactment on its head. Indeed, it is inconceivable to me that Congress would pass a statute codifying, approving of, and thus continuing the consistent past practice of the Department in protecting U.S. workers' wage rates, but at the same time want that mandate and protection to lay dormant until some future date at which it could be shown anew that there are depressed wages of U.S. workers to address. It is clear that in passing the statute Congress recognized the *present* depressed wages caused by alien labor and it is clear Congress wanted to rectify that wage depression immediately, by the passage of this very statute, not at some date in the future. Thus, I find that regulations passed this year must comply with the mandate set forth by Congress at 8 U.S.C. § 1186(a)(1)(B), notwithstanding the use of the word "will" in that section. The issue of whether these regulations promulgated as of June 1, 1987, (which are final and currently in effect) do indeed comply with the law is, therefore, an issue ripe for adjudication.

**C. Discretion**

■ The defendants' third argument against review is that the mandate to the

Secretary in IRCA is so broad as to be completely discretionary and thus beyond the review of a Court. *See* 5 U.S.C. § 701(a)(2) (judicial review of agency action is available except to the extent that "agency action is committed to agency discretion by law."). Defendants analogize the mandate of IRCA to statutes which are drawn so broad that "there is no law to apply and no issues capable of judicial resolution." Fed.Def.Br. at 12 (citations omitted). *See, e.g., Heckler v. Chaney,* 470 U.S. 821, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985) (judicial review precluded when "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion").

I find that in this case there is a meaningful standard against which to judge the agency's action. Specifically, IRCA requires the Department to ensure that the importation of foreign workers "will not adversely affect the wages and working conditions of workers in the United States similarly employed." 8 U.S.C. § 1186(a)(1)(B). The regulations at issue can be judged to determine whether, in setting the AEWR at average wage rates, they protect the wages and working conditions of American workers as required by Congress. Moreover, despite defendants' argument that this issue is not capable of review, the reasonableness of DOL's AEWR has been the subject of judicial review on numerous occasions in the past. *See, e.g., Florida Fruit & Vegetable Asso. v. Brock,* 771 F.2d 1455 (11th Cir.1985), *cert. denied,* 475 U.S. 1112, 106 S.Ct. 1524, 89 L.Ed.2d 921 (1986); *Production Farm Management v. Brock,* 767 F.2d 1368 (9th Cir.1985); *NAACP v. Donovan,* 765 F.2d 1178 (D.C.Cir.1985); *Shoreham Cooperative Apple Producers Asso. v. Donovan,* 764 F.2d 135 (2nd Cir.1985); *Florida Sugar Cane League, Inc. v. Usery,* 531 F.2d 299 (5th Cir.1976); *Limoneira v. Wirtz,* 225 F.Supp. 961 (S.D.Ca.1963) *aff'd.* 327 F.2d 499 (9th Cir.1964).

## III. MERITS

■ The simple issue plaintiffs present is, once again, whether the regulations promulgated by the Department will sufficiently protect the U.S. workers so as to ensure that the importation of alien workers "will not adversely affect the wages and working conditions of workers in the United States similarly employed." 8 U.S.C. § 1186(a)(1)(B). I find that DOL has failed to demonstrate that the regulations it promulgated do anything to protect the wages and working conditions of workers in the United States and thus these regulations are contrary to law.

The Department argues that the passage of IRCA justifies its abandonment of the old AEWR methodology. *See, e.g.,* 52 Fed. Reg. 20504 (June 1, 1987); Fed.Def.Br. at 1, 39. The Department contends that this is so because "the universe of employers who may seek H–2A workers could expand considerably as a result of IRCA." 52 Fed.Reg. 20504 (June 1, 1987). Accordingly, the Department decided to publish AEWRs for 49 states again this year, instead of just for the 14 user-states where depressed wages rates have been found by the Department. *Id.* Not surprisingly, when applying the traditional methodology to states without depressed wages as well as to the traditional user-states, DOL found "there would be wide variations between States in terms of the relationship of the AEWR to average hourly earnings ..." *Id.* Thus, the Department simply decided to abandon the traditional methodology—which had yielded AEWRs 20% above average hourly wage rates in user-states—and to set the so-called AEWR equal to average hourly earnings.

The Department's reliance on IRCA to justify this 20% reduction in American workers' wages is misplaced. Nothing in IRCA changes the *mandate* to the Secretary of Labor that he must protect American wages.[9] As noted above, *see supra* at

---

9. The Department recognized this simple principle in its draft regulation where it wrote:

The IRCA amendments to the INA do not change the role and effect of DOL's policies to protect the wages of similarly employed U.S. agricultural workers from the adverse effects which may result from the employment of alien workers.

33–34, the new statutory provision adopts almost word for word the same mandate that DOL had been operating under pursuant to the INS regulations. Contrary to DOL's argument, Congress's codification of this language indicates an *acceptance* of the manner in which the Department had been implementing the INS regulations and the codification is a mandate from Congress to continue that same policy. *See Lindahl v. Office of Personnel Management,* 470 U.S. 768, 105 S.Ct. 1620, 1629 and n. 15, 84 L.Ed.2d 674 (1985); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 381–82, 102 S.Ct. 1825, 1840–41, 72 L.Ed.2d 182 (1982); *Lorillard v. Pons,* 434 U.S. 575, 580–81, 98 S.Ct. 866, 869–70, 55 L.Ed.2d 40 (1978); *Allen v. United States,* 625 F.Supp. 841, 847 (D.D.C.1986). Indeed, these cases hold that:

> Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it reenacts a statute without change ... So too, where ... Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute.

*Lorillard,* 434 U.S. at 580–81, 98 S.Ct. at 869–70 (citations omitted). According to this principle of statutory construction, Congress is presumed to be aware that the Department's implementation of its regulatory AEWR mandate had yielded AEWRs approximately 20% above average hourly wages. By incorporating the very words of the previous regulatory mandate into the IRCA statute, Congress implicitly approved the results that mandate had yielded—that is, AEWRs 20% above the average wage rates. Thus if IRCA says anything to the Department about AEWRs, it tells the Department to find some methodology which will continue to produce an enhanced wage rate and continue to protect American workers; it does not, as the defendants

argue, give the Department license to do away with its previous protective rates.

The only other justification for doing away with a higher AEWR would be that wages are no longer depressed by alien workers. Again, though, the Department concedes that this is not the case. The Department admits that, in areas where there has been importation of alien labor in the past, the wages of American workers are presently depressed. Once again, I note the Department's own findings in its March 13 draft:

> ... the addition of a 20–percent "differential" is appropriate for a variety of reasons. A differential is needed to compensate for past adverse effect. *It is widely recognized that such adverse effect has occurred, even though precise measurement is difficult.* DOL has recognized the existence of past adverse effect explicitly in its regulations since 1978, and implicitly well before that. In addition to compensating for past adverse effect, a differential also compensates for a lag in availability of USDA average hourly wage data, on the assumption that wage rates generally tend to go upward over time.

Draft Regulations at 31 (emphasis supplied). It only makes sense given the presence of the depressed wage rates, that to protect American workers the AEWR must be set *above* the average wage in the region. Again, the March 13 draft regulations recognized this necessity by proposing the establishment of an AEWR which would simply be set by adding a 20% differential to average wages:

> A 20–percent differential relates well to the experience in the 14 traditional user States, where the AEWRs have been defended successfully, as providing reasonable and lawful protection for U.S. workers. The actual differential between the current-year AEWRs under the current methodology and the previous-year USDA data have for at least the past decade tended to average 20 percent.

Draft Regulations at 31–32. Hence, given the fact that IRCA did not change DOL's

Draft Regulations at 21.

mandate to protect U.S. workers, and given the admitted presence of depressed wages, to set the AEWR equal to the depressed wage, as the Department has done, is arbitrary and capricious and in complete contradiction of the law.

I want to make clear that I do not find that the Department must institute the 20–percent differential method for setting AEWRs proposed in the March 13 draft, or any other specific method. Though the plaintiffs stress the necessity of this bonus-like arrangement, I agree with the defendants that there is no magic formula for setting the AEWR. *See Shoreham Cooperative Apple Producers Asso., Inc. v. Donovan,* 764 F.2d 135, 141 (2d Cir.1985) ("[n]either the ... Act nor the regulations promulgated thereunder specify any formula that DOL must use in carrying out the statutory purpose."). The statutory language is broad and nowhere does the statute require an AEWR must be 20% above prevailing wage rates in an area.[10] As I mentioned at oral argument in this case, the Department does have wide discretion and could, for example, set the AEWR equal to a pegged-rate as opposed to a moving or variable rate. However, just because the Secretary has broad discretion in establishing and adopting a method for protecting American workers' wages, does not mean he can do nothing. Having found the existence of a depressed wage environment in a particular region, he must do something to offer the required protection. In this instance, I do not find that the regulations promulgated are vulnerable because a methodology was was used which I do not approve of. Rather, I find that the regulations are contrary to law because the particular method chosen will not carry out the Secretary's statutory responsibility to address the depressed wages of American workers.

Notwithstanding my conclusion that the Department need not adopt the 20% differ-

ential formula endorsed by the March 13 draft regulation, I am nonetheless very troubled by the lack of an acknowledgement by the Department that the old methodology yielded AEWRs which were approximately 20% higher than what the new methodology will yield. The March 13, 1987 draft circulated by the defendants not only proposed a 20% differential formula, but indicated that such a differential was necessary to protect U.S. workers. Draft Regulations at 31 ("A differential is *needed* to compensate for past adverse effect.") (emphasis supplied). Given this "necessity"—as well as the long history of AEWRs which were approximately 20% above prevailing wages—the Department, in its June 1, 1987, should have acknowledged and explained why it was suddenly abandoning an enhanced wage rate in favor of an average wage rate. *See, e.g., Motor Vehicle Mfrs. Asso. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 42–3, 50, 103 S.Ct. 2856, 2866–67, 2870, 77 L.Ed.2d 443 (1983); *Nat'l. Black Media Coalition v. FCC,* 775 F.2d 342, 355 (D.C.Cir.1985); *NAACP v. Donovan,* 765 F.2d 1178, 1183–1185 (D.C.Cir. 1985). Instead, the final regulations (June 1) simply mimic the language of the March 13 draft with all references to a 20% differential excised. The explanatory section that appears with the new regulations does admit that the Department has adopted a new methodology. 52 Fed.Reg. 20502–20505. However, this section rather disingenuously fails to acknowledge that the old AEWR methodology produced wage rates approximately 20% above prevailing wages and that this 20% differential is essentially wiped out by the new methodology. Though, again, I agree with the agency that it certainly enjoys the ability to change its own regulations, to do so without credible explanation is arbitrary and capricious. *See NAACP v. FCC,* 682 F.2d 993 (D.C.Cir. 1982) ("where policy has been altered, the court should be satisfied both that the

---

**10.** I again note, however, that in codifying the mandate of the earlier regulations, Congress is presumed to have had knowledge of the manner in which this mandate had been carried out— that is, according to a formula which yielded wages 20% higher than the average wage rates. By adopting almost the exact words of the earli-

er regulations, Congress implicitly approved of the Department's specific prior method of effectuating the mandate. Hence the use of some method which yields AEWRs approximately 20% above prevailing wages has a certain presumption in its favor. *See* pages 37–38, *supra.*

agency was aware it was changing its views and has articulated permissible reasons for that change, and also that the new position is consistent with law").

To summarize: I find nothing in IRCA which removes from the Department of Labor the responsibility for establishing an AEWR which will protect the wages of American workers. On the contrary, the new immigration law, by codifying existing regulations, emphasizes Congress's desire that the Department continue its previous policy of setting an AEWR greater than prevailing wage rates. Nor is there any serious contention that wage rates are no longer depressed and thus that an AEWR need no longer be set above these depressed wages. Therefore, the Department must act to carry out is responsibilities. Though I am not requiring it to chose any particular methodology for establishing an AEWR, I do find that its present formula does nothing to protect American workers and thus is not in accordance with law. Further, I find the process by which the Department arrived at the present rules flawed by the absence of an appropriate explanation.

## IV. CONCLUSION

Because the Department's regulations are contrary to law and because the process by which the regulations were adopted is full of contradiction and devoid of reason, I conclude that these regulations must be struck down. Accordingly, I shall enter an Order enjoining the implementation of the regulations.[11] An appropriate Order accompanies this Memorandum. The case will be remanded to the Secretary of Labor to take such action as necessary consistent with his Congressional mandate and with this Memorandum and the accompanying Order.

## ORDER

For the reasons stated in the Memorandum dated August 5, 1987, it is this 5th day of August, 1987, hereby

ORDERED that defendants' motion to dismiss be denied in part and that plaintiffs' motion for a preliminary and permanent injunction be granted in part and that judgment on the adverse effect wage rate issue be entered for the plaintiffs; and it is further

DECLARED that the regulations published at 20 C.F.R. Parts 655.107 as set forth in 52 Fed.Reg. 20521 (June 1, 1987) are contrary to law; and thus it is further

ORDERED that the defendants shall be enjoined from implementing these regulations; and it is further

ORDERED that any new regulations promulgated by the Secretary of Labor to replace the regulations herein declared contrary to law shall effectuate and be consistent with the statutory requirements set forth at 8 U.S.C. § 1186(a)(1)(B) and with the accompanying Memorandum; and it is further

ORDERED that, within thirty (30) days of the date of this Order, the Secretary of Labor shall establish an interim adverse effect wage rate consistent with the accompanying Memorandum and this Order which shall be in effect, after approval of this Court, until such time as new regulations can be promulgated; the Secretary shall not grant H–2A temporary labor certifications under 20 C.F.R. Part 655 or issue H–2A visa pursuant to 8 U.S.C. § 1101(a)(15)(H)(ii)(a), until this Court approves the interim adverse effect wage rate; and it is further

ORDERED that until further Order of this Court, the defendants shall:

(1) Refrain from granting H–2A temporary labor certifications under 20 C.F.R. Part 655 or from issuing H–2A visa pursuant to 8 U.S.C. § 1101(a)(15)(H)(ii)(a), except on the condition that the employer seeking such certification agrees to pay all workers employed in the crop activity described in

---

**11.** As noted at fn. 2, *supra,* I shall also enter an Order with respect to the piece-rate regulations because the establishment of the AEWR could have an effect on the appropriate hourly rate due a piece-rate worker. The plaintiffs' other objections to the piece-rate regulations are still under advisement. The parties are free to file supplemental briefs on the issues remaining, and to request argument on these issues, should they so desire.

its H–2A application, retroactive to the beginning of the season the difference between the wages paid and the wages required by new piece-rate regulations, should the plaintiffs prevail on their challenge to these regulations;

(2)(a) Attach to all interstate clearance orders an announcement stating that a challenge to the current piece-rate regulations is pending and that, if plaintiffs prevail, workers may be paid, retroactive to the beginning of the 1987 season, at piece-rates other than those advertised; and

(b) Direct all state agencies to attach such notice to all local and intrastate job orders.