AMERICAN FEDERATION OF LABOR AND CONGRESS of INDUSTRIAL ORGANIZATIONS, et al.

v.

William E. BROCK, III, Secretary of Labor, et al. National Council of Agricultural Employers, et al., Appellants.

AMERICAN FEDERATION OF LABOR AND CONGRESS of INDUSTRIAL ORGANIZATIONS, et al.

v.

William E. BROCK, III, Secretary of Labor, et al., Appellants,

National Council of Agricultural Employers, et al.

AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS, et al.

v.

William E. BROCK, III, Secretary of Labor, et al. American Farm Bureau Federation, Appellants.

Nos. 87–5258—87–5260.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 23, 1987.

Decided Dec. 22, 1987.

John S. Koppel, Dept. of Justice, with whom Richard K. Willard, Asst. Atty. Gen., Dept. of Justice, Joseph E. diGenova, U.S. Atty., Michael Jay Singer, Dept. of Justice and Harry L. Sheinfeld, Dept. of Labor, Washington, D.C., were on the brief for appellants, Brock, Secretary of Labor, et al. in No. 87–5259.

John M. Simpson, with whom Carl W. Vogt, Warren Belmar and Robert A. Burgoyne, for Nat. Council of Agr. Employers, et al., Kathryn A. Oberly, Washington, D.C., Michael F. Rosenblum, Chicago, Ill., and Patricia A. McCoy, Washington, D.C., for American Farm Bureau Federation were on the joint brief for appellants, Nat. Council of Agr. Employers, et al. in Nos. 87–5258 and 87–5260.

Shelly Davis, with whom Edward Tuddenham, Hereford, Tex., Garry G. Geffert, Martinsburg, W. Va., and David Silberman, Washington, D.C., were on the brief, for appellees.

Before WALD, Chief Judge, BUCKLEY and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Chief Judge WALD.

WALD, Chief Judge:

The Department of Labor (Department) is appealing a district court judgment overturning regulations it promulgated on May 5, 1987, and adopted as final on June 1, 1987.[1] The American Federation of Labor and Congress of Industrial Organizations (AFL-CIO) and individual named plaintiffs below, argue here that the district court's invalidation should be affirmed. In the regulations at issue, the Department significantly altered its prior regulatory policy on minimum wage rates that employers must pay to foreign agricultural workers. Because we find that the Department did not provide a reasoned explanation for its new policy, we order remand.[2]

## I. FACTS

The Immigration and Nationality Act of 1952 (INA), as amended, 8 U.S.C. §§ 1101 *et seq.* (1982 & Supp. III 1985), delegated regulation of the importation of foreign workers to the Attorney General. Section 1101(a)(15)(H)(ii) authorized the Attorney General to approve visas to temporary foreign workers "if unemployed persons capable of performing such service or labor cannot be found in this country." *Id.* § 1101(a)(15)(H)(ii). Pursuant to this congressional direction, the Attorney General promulgated 8 C.F.R. § 214.2(h)(3) (1986), which required employers seeking foreign workers to secure certification from the Department that:

> (a) qualified persons in the United States are not available; and

> (b) that the employment of the [alien] will not *adversely affect* the wages and working conditions of workers in the United States similarly employed.

*Id.* (emphasis added).

In turn, the Department adopted its so-called H-2 regulations to govern this certification process. Congress' mandate that foreign workers not adversely affect the wages of United States workers was accomplished through minimum wage requirements. Employers were prohibited from paying foreign workers below an hourly "adverse effect wage rate" (AEWR). These wage levels were designed to approximate the rates that would have existed had there been no increase in labor supply from foreign labor. If no American workers applied for positions at these rates, employers were permitted to fill the vacancies with foreigners. Also, if domestic workers demanded higher than AEWR wages from H-2 growers, those workers could be considered unavailable and the positions filled with foreign workers. *See* 20 C.F.R. §§ 655.203, -.206 (April 1, 1987). Controls were also applied to piece rates, again to offset the depressing effect on wages caused by influxes of foreign workers.

1. Grower intervenors, the National Council of Agricultural Employers (NCAE), et al., join the Department and other defendants below in appealing the district court's ruling. *See* Brief of Appellants-Intervenors at i-ii.

2. Since we reverse the district court's invalidation of the "adverse effect wage rate" (AEWR) regulations on statutory grounds and remand the case to the Department for a more adequate explanation of its actions, we vacate the district court's injunctive relief award. Similarly, the preliminary injunction against implementation of the Department's new piece rates must also be vacated. The district court, in two footnotes to its AEWR decision, based the preliminary injunction entirely on the tie between those piece rates and the illegality of the AEWRs. *See AFL-CIO v. Brock,* 668 F.Supp. 31, 33 n. 2, 40 n. 11 (D.D.C.1987), Joint Appendix (J.A.) at 664, 665-66 n. 2, 684 n. 11. Simply put, a worker paid on a piece rate basis must be paid an average hourly wage at least equal to the AEWR. *See* 20 C.F.R. § 655.102(b)(9)(ii)(A), 52 Fed.Reg. 20,515 (1987). Since we do not affirm the district court's finding of the AEWRs' illegality, plaintiffs-appellees can no longer demonstrate a likelihood of success on their attack on the new piece rates, hence the district court's ground for the injunction no longer exists.

In 1986, Congress enacted the Immigration Reform and Control Act (IRCA or "the Act"), Pub.L. No. 99–603, 100 Stat. 3359 (Nov. 6, 1986), which overhauled United States immigration policy. Among the changes to the INA is an amendment that prohibits the Department from approving the importation of foreign workers unless such employment "will not adversely affect the wages and working conditions of workers in the United States similarly employed." *Id.* § 301(c), 100 Stat. 3411. The new legislation thus expressly incorporates the adverse effect prohibition that the Department had earlier introduced by regulations in order to meet Congress' resolve that American workers not be injured by immigration policies. *See* 41 Fed.Reg. 25,-017, 25,018 (1976). Like its precursor, however, the IRCA does not define "adverse effect." Nor does the Act specify how adverse effect is to be measured. The Department is entrusted with these tasks. Throughout its twenty year oversight of the INA, the Department periodically increased AEWRs and piece rates to compensate for *past* adverse wage effects.[3] The Department first accomplished this by linking AEWRs to manufacturing wages, on the theory that farm wages had stagnated because of the enormous past influx of Mexican workers between 1951 and 1964.[4] Thereafter, this original, enhanced base was indexed according to United States Department of Agriculture (USDA) data. This methodology produced AEWRs that exceeded average farm wages by approximately 20%. *See* Brief of Appellants at 8.

On June 1, 1987, contemporaneously with the passage of the IRCA, the Department issued a new methodology to measure AEWRs and piece rates. Although an unofficial, draft version urged that AEWRs be set 20% above the average farm wage for each state to compensate for past ad-

verse effect, *see* Department of Labor Draft H–2A Regulations, the final regulations set AEWRs for all states (except Alaska) equal to the average hourly wages paid the prior year by employers. 52 Fed. Reg. 20,496, 20,504 (1987). Under these new H–2A AEWRs, foreign farm laborers—and indirectly United States workers who will be recruited at the same AEWRs —face possible wage cuts from the old H–2 AEWRs. This threat led appellees, AFL–CIO and individual named parties, to challenge the new AEWR regulations as both contrary to congressional intent and arbitrary and capricious, hence violative of the Administrative Procedure Act (APA). The district court invalidated the new AEWR regulations, *see AFL–CIO v. Brock,* 668 F.Supp. 31 (D.D.C.1987), J.A. at 664, and the Department appeals from that decision.

## II. ANALYSIS

Succinctly stated, the crux of the controversy is as follows: Under the IRCA, the importation of a farmworker *cannot* by itself have a future adverse effect on wages, since each foreign worker must be paid at least the average rate that growers paid workers prior to that worker's arrival. However, where the pre-arrival wages were already depressed from the presence of undocumented aliens, the new rates will necessarily perpetuate this past adverse effect. Appellees argue that under the IRCA, the Department must continue its former regulatory policy of offsetting this past injury through enhanced AEWRs, while appellants insist that the Department's June 1, 1987 regulations properly limited AEWRs to prevent *future* wage depression.

### A. *Congressional Intent*

In determining whether the Department's new AEWR regulations are consist-

---

**3.** *See* 50 Fed.Reg. 50,311, 50,312 (1985) (proposal to enhance AEWR because "continued reliance on the use of undocumented aliens has had a depressing effect on the wages of similarly employed U.S. workers"); 51 Fed.Reg. 11,942 (1986) (same); 20 C.F.R. § 655.200(b) (1986) (definition of AEWR tied to offsetting past wage depression); 20 C.F.R. § 655.200(b) (1987) (same).

**4.** These workers entered under the Migrant Labor Agreement of 1951, popularly known as the "Bracero" program. *See* Dellon, Foreign Agricultural Workers and the Prevention of Adverse Effect, 17 Lab.L.J. 739, 748 (1966).

ent with the statutory mandate, we look to the principles announced by the Supreme Court in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In reviewing an agency interpretation of a statute, courts ask first whether Congress has spoken directly to the issue. Here Congress has not. Congress, indeed, has never paid any attention to the method or policy of calculating AEWRs. It paid no attention in 1964, and it paid no attention in 1987. Throughout, calculating AEWRs has been left entirely to the Department's discretion.[5] The committee and floor discussion on the IRCA, cited by both parties, confirms only Congress' general intent to protect United States workers against adverse effects from imported labor. *See* Brief of Appellees at 8 (citing H.Rep. No. 682, 99th Cong., 2d Sess. 80, *reprinted in* 1986 U.S.Code Cong. & Admin.News 5649, 5684); Brief of Appellants at 5–6 (citing H.R.Rep. No. 99–682(I), 99th Cong., 2d Sess. 50 & passim, *reprinted in* 1986 U.S. Code Cong. & Admin.News 5649 & passim).

### 1. *Reenactment Doctrine*

Appelles argue, however, that the regulation contradicts a distinct congressional purpose to offset the effects of *past* wage depression through enhancements of AEWRs. *See* Brief of Appellees at 23 ("IRCA does require that the methodology [for calculating AEWRs] achieve the policy goal set by Congress of offsetting the adverse effect of past wage depression."). This intent, appellees argue, must be inferred from Congress' express incorporation in the IRCA of the Department's "adverse effect" regulatory prohibition,

which had always been interpreted to justify compensation for the ongoing adverse effects from past wage depression.

The Supreme Court warned in *Girouard v. United States,* 328 U.S. 61, 69, 66 S.Ct. 826, 830, 90 L.Ed. 1084 (1946), that "[i]t is at best treacherous to find in congressional silence alone the adoption of a controlling rule of law." *See also United States v. Sheffield Bd. of Comm'rs,* 435 U.S. 110, 134, 135, 98 S.Ct. 965, 980, 981, 55 L.Ed.2d 148 (1978) (legislative history of reenactment must show express approval of longstanding administrative interpretation for such interpretation to be treated as ratified by Congress). *See generally,* R. Dickerson, The Interpretation and Application of Statutes 182–83 (1975) (same). This court has also consistently required express congressional approval of an administrative interpretation if it is to be viewed as statutorily mandated. *See, e.g., International Union, UAW v. Brock,* 816 F.2d 761, 767 (D.C.Cir.1987) (finding no *"affirmative* step taken by Congress that indicates an intent to ratify the agency's interpretation") (emphasis in original); *Association of Am. R.Rs. v. ICC,* 564 F.2d 486, 493 (D.C.Cir.1977) ("Congress must not only have been made aware of the administrative interpretation, but must also have given some 'affirmative indication' of such intent.") (footnote omitted); *Plasterers Local Union No. 79, AFL–CIO v. NLRB,* 440 F.2d 174 (D.C.Cir.1970) ("Reenactment of a section of law does not of itself constitute conclusive legislative approval of either decisions or administrative regulations construing the provision, in the absence of a showing that the attention of Congress was specifically directed to the matter at

---

**5.** Contrary to appellees' argument, caselaw supports the Department's discretion to make methodological changes in measuring AEWRs. For instance, when USDA data was unavailable between 1982 and 1985, the Department keyed its indexing process to unemployment compensation data. *See Shoreham Co-op Apple Producers v. Donovan,* 764 F.2d 135, 141–43 (2d Cir.1985). Similarly, the Department adopted a new methodology in 1981, based on average piece rate earnings, which produced AEWRs higher than those produced by the traditional methodology. This formula was withdrawn before its effective date as part of the Reagan Administration's general review of agency regulations. Appellees themselves remark on the variety of methodologies devised and experimented with by the Department to protect the earnings of piece rate workers. *See* Plaintiffs' Statement of Points and Authorities in Support of Their Motions for a Temporary Restraining Order 9, J.A. at 30. This evidence supports the Department's argument that Congress did not circumscribe the Department's discretion under either Act. Nevertheless, these variations never conflicted with the Department's policy of enhancing AEWRs to compensate for past wage depression.

hand."), *rev'd on other grounds,* 404 U.S. 116, 92 S.Ct. 360, 30 L.Ed.2d 312 (1971). Appellees in this case offer no evidence that Congress was even aware of the Department's policy of compensating for past wage depression.[6] Indeed, after the IRCA was enacted, when the Department sent draft regulations to Congress that included a 20% AEWR enhancement for past adverse wage depression, the Department encountered a storm of congressional protest insisting that the Department had misinterpreted Congress' intent. *See* Congressional Comments, J.A. at 1041 & passim (approximately one hundred representatives protest to Department).

In any case, even had there been indications that Congress knew of the Department's former adverse effect test requiring that the effects of past wage depression be offset through enhanced AEWRs, the Supreme Court has stated that such legislative approval of an agency's policy does not necessarily preclude the agency from subsequently changing that policy. The doctrine that an

administrative construction receives legislative approval by reenactment of a statutory provision ... does not mean that a regulation interpreting a provision of one act becomes frozen into another act merely by reenactment of that provision, so that administrative interpretation cannot be changed prospectively through exercise of appropriate rulemaking powers.

*Helvering v. Wilshire Oil Co.,* 308 U.S. 90, 100–01, 60 S.Ct. 18, 24, 84 L.Ed. 101 (1939).

To freeze an agency interpretation, Congress must give a strong affirmative indication that it wishes the present interpretation to remain in place. We certainly find no such indication here. Thus appellees' argument that enactment of the adverse effect language alone freezes into law the agency's previous interpretation of the regulation cannot stand.

*2. Repeal by the IRCA*

The Department and appellants-intervenors, on the other hand, argue that the plain language of the IRCA supports the Department's decision not to permit AEWRs to offset *past* wage depression. The Act requires that "the employment of the alien ... *will* not adversely affect the wages and working conditions of workers in the United States similarly employed." IRCA § 301(c), Pub.L. No. 99–603, 100 Stat. 3359, 3411 (Nov. 6, 1986) (emphasis added). The grower-intervenors reason from the future tense of the verb that Congress intended only to eliminate wage depression prospectively. *See* Brief of Appellants-Intervenors at 23–24; *see also* Reply Brief of Appellants at 2, 3, 5 n. 5. Though plausible, this position ignores the fact that the future tense was also used in the Department's earlier adverse effect regulations, which the Department consistently interpreted to require enhancing AEWRs to compensate for past wage depression. Apart from this semantic argument, which we find unpersuasive, appellants offer no other evidence to show that Congress' recodification of the H–2 pro-

6. The district court mistakenly relied on the familiar notion that Congress is presumed to be aware of administrative interpretations of a statute or regulation when it adopts such language in a statute. Though courts have stated this general proposition, usually as a defense to a later attack against the same interpretation, *no* case has rested on this presumption alone as a basis for holding that the statute required that interpretation. *See, e.g., Lindahl v. OPM,* 470 U.S. 768, 782–86, 105 S.Ct. 1620, 1628–31, 84 L.Ed.2d 674 (1984) (evidence in legislative history that Congress was aware of particular interpretation); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 382–88, 102 S.Ct. 1825, 1841–44, 72 L.Ed.2d 182 (1981) (same); *Lorillard v. Pons,* 434 U.S. 575, 581–85, 98 S.Ct. 866, 870–72, 55 L.Ed.2d 40 (1978)

(same); *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 414 n. 8, 95 S.Ct. 2362, 2370 n. 8, 45 L.Ed.2d 280 (1975) (same); *NLRB v. Gullett Gin Co.,* 340 U.S. 361, 366, 71 S.Ct. 337, 340, 95 L.Ed. 337 (1951) (same); *City of New York v. FCC,* 814 F.2d 720, 724, 725 (D.C.Cir.1987) (same), *cert. granted,* —— U.S. ——, 108 S.Ct. 449, 98 L.Ed.2d 389 (1987). The authority to whom the Supreme Court as well as lower courts refer for this rule of statutory construction makes this qualification explicit: "[The rule of implied adoption of an agency interpretation on reenactment] does not apply where nothing indicates that the legislature had its attention directed to the administrative interpretation upon reenactment." C. Sands, Sutherland on Statutory Construction § 49.09, at 400 (footnote omitted) (4th ed. 1984).

gram was designed to relax the protection given to United States farmworkers. Clearly, the new provision of the IRCA, which exactly reiterates the language of the Department's prior regulation, is not in "irreconcilable conflict" with the Department's previous policy of enhancing AEWRs. *See Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 468, 102 S.Ct. 1883, 1890, 72 L.Ed.2d 262 (1982) (implied repeal will be found when later act is in " 'irreconcilable conflict' " with previous mandate) (quoting precedent).

### B. *Rationality of the DOL's Policy Reversal*

Because we do not find that the new Act explicitly or implicitly mandates the Department's AEWR policy—that is, because neither the Department's former policy of off-setting for past depression, nor its present policy of ignoring this adverse effect, is statutorily required—we must proceed to the second level of the *Chevron* analysis and decide whether the Department's changed interpretation is "permissible." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). The same test used to determine the permissibility of an initial agency action is applied to agency changes in policy. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut.Auto.Ins.Co.*, 463 U.S. 29, 41–44, 103 S.Ct. 2856, 2865–67, 77 L.Ed.2d 443 (1983); *Association of Am. R.Rs. v. ICC*, 564 F.2d 486, 495 (D.C.Cir.1977). That is, we will overturn an agency rule if the action is found to have been "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1976); *see Citizens To Preserve Overton Park v. Volpe*, 401 U.S. 402, 413–14, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971).

Courts are generally deferential to longstanding policies or statutory interpretations of an agency, and they closely examine recent departures from such agency precedent. *See NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 274–75, 94 S.Ct. 1757, 1761–62, 40 L.Ed.2d 134 (1974). At the same time, however, courts recognize that agencies must respond to changed circumstances to carry out Congress' purposes. To accommodate both the need for settled courses of behavior and the imperative of flexibility, the Supreme Court has said that an

> agency may flatly repudiate ... [its prior] norms, deciding, for example, that changed circumstances mean that they are no longer required in order to effectuate congressional policy. Or it may narrow the zone in which some rule will be applied, because it appears that a more discriminating invocation of the rule will best serve congressional policy.... *Whatever the ground for the departure from prior norms, however, it must be clearly set forth so that the reviewing court may understand the basis of the agency's action and so may judge the consistency of that action with the agency's mandate.*

*Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 808, 93 S.Ct. 2367, 2375, 37 L.Ed.2d 350 (1973) (emphasis added); *see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) ("an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change"); *National Black Media Coalition v. FCC*, 775 F.2d 342, 355–56, 356 n. 17 (D.C.Cir.1985) (agency must offer sufficient explanation to ensure court that it is not "repudiat[ing] precedent simply to conform with a shifting political mood"); *Brae Corp. v. United States*, 740 F.2d 1023, 1038 (D.C.Cir.1984) ("agency must explain why the original reasons for adopting the rule or policy are no longer dispositive"), *cert. denied*, 471 U.S. 1069, 105 S.Ct. 2149, 85 L.Ed.2d 505 (1985); *Hatch v. FERC*, 654 F.2d 825, 834 (D.C.Cir.1981) (same).

The June 1, 1987 AEWRs represent a dramatic shift in the Department's wage policy. In the past, the Department has responded to depressed wages caused by the past employment of temporary and undocumented foreign workers by enhancing the AEWR above this depressed wage level; now it asserts that it will no longer consider such past effect. The Depart-

ment's abrupt reversal of its enhancement policy marks a significant, highly redistributive, change in policy. The policy of enhancing AEWRs—to the benefit of all farmworkers—has been explicit in the Department's regulations at least since 1978. *See* Reply Brief of Appellants at 6 (acknowledging that "the former AEWR methodology was intended to correct for past wage depression"); *see also supra* note 3. Although we have held that this policy was not statutorily required, it has been upheld repeatedly by courts. *See, e.g., Production Farm Management v. Brock,* 767 F.2d 1368, 1371 (9th Cir.1985) (Department determination that "pool of alien workers had depressed the wages of similarly employed United States workers ... permitted DOL [Department] to set an AEWR higher than the prevailing wage rate"); *Rowland v. Marshall,* 650 F.2d 28, 30 (4th Cir.1981) (per curiam) (same); *Florida Sugar Cane League, Inc. v. Usery,* 531 F.2d 299, 304 (5th Cir.1976) (same).

Because the Department makes no *explanatory* attempt to "forthrightly distinguish or outrightly reject" this contradictory precedent,[7] we and the public are "left with no guideposts for determining the consistency of administrative action ... or for accurately predicting future action" by the agency. *Hatch v. FERC,* 654 F.2d 825, 834–35 (D.C.Cir.1981). The sparse discussion in the Federal Register[8] does not sustain such a basic change in the Department's interpretation of its statutory mandate. In adopting the new AEWRs, and abandoning its prior policy of compensating

for *past* wage depression, the Department chiefly relies on two explanations: (1) The IRCA creates new circumstances that justify the Department's policy reversal; and (2) the old methodology caused wage rate anomalies and was difficult to calculate. *See* 52 Fed.Reg. 20,496, 20,504 (1987); *see also* Reply Brief of Appellants at 3–4.

First, the Department asserts that its new AEWR regulations represent the contemporaneous interpretation of new legislation. *See* Brief of Appellants at 13–15; 52 Fed.Reg. 20,496, 20,504 (1987). In the rulemaking record, this point is baldly stated, without elaboration except for a prediction that the pool of documented H–2A workers may expand considerably. *Id.* In subsequent submissions to this court, the Department stresses that the IRCA radically alters United States immigration policy, and specifically, that because all future imported workers allegedly will be documented and employed at the AEWR wage floor, "the source for the alleged wage depression in the past, i.e., undocumented aliens, will cease to exist." Reply Brief of Appellants at 5. The Department's observation that the IRCA constitutes a change in United States immigration law, albeit correct at a general level, is undercut by the Department's own emphasis in the Federal Register on the IRCA's continuity with its precursor in the matter of wage protection for American workers. 52 Fed.Reg. 20,496, 20,502 (1987). Congress made absolutely no alteration to the statutory mandate that underlies AEWRs. The regulatory adverse effect prohibition promulgated pursuant to

---

**7.** In its rulemaking notice, the Department considered only alternatives that would also reverse the prior policy of offsetting depression from past employment. 52 Fed.Reg. 20,496, 20,504 (1987). This failure to consider the obvious alternative of maintaining the enhancement policy runs counter to our caution that "an agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion it may cross the line from tolerably terse to the intolerably mute." *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 852 (D.C.Cir.

1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971) (footnotes omitted).

**8.** In their submissions to this court, the Department and intervenors set forth additional reasons, such as assisting United States farmers to be more competitive on world markets, *see* Brief of Appellants–Intervenors at 31, to justify the new methodology for calculating AEWRs. Because we must confine our inquiry to statements made in the course of the rulemaking proceedings, however, we exclude them from this analysis. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.,* 463 U.S. 29, 50, 103 S.Ct. 2856, 2870, 77 L.Ed.2d 443 (1983).

the INA was expressly retained in the IRCA. Deference to an agency's contemporaneous interpretation of a new statute to "'mak[e] the parts work efficiently and smoothly while they are yet untried and new,'" *see Power Reactor Development Co. v. International Union of Elec., Radio & Machine Workers,* 367 U.S. 396, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961) (quoting *Norwegian Nitrogen Products Co. v. United States,* 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796 (1933)), obviously does not apply where, as in this case, the parts are very well tried and date as far back as 1964. And appellants' more specific argument that under the IRCA the presence of documented foreign workers can no longer cause future wage depression, even if true, begs the question. Appellees' challenge is to the Department's failure to consider the *past* presence of aliens as it affected last year's wages, which are the basis for the new AEWRs. Even if the IRCA does eliminate the future labor pool of illegal aliens, AEWRs keyed to rates prevailing when undocumented workers were present necessarily will perpetuate wage depression. The Department did not address this core argument in any adequate or detailed way during the rulemaking. As a result, we are unable to discern the reasonableness of the agency's action without further explanation.

The Department's alternative explanation for its policy reversal focuses on the methodological difficulties of measuring wage depression caused by the past presence of foreign workers. 52 Fed.Reg. 20,-496, 20,502–05 (1987). In particular, the

Department points to "unacceptable discrepancies" between AEWRs and average hourly earnings in "non-user" states.[9] For instance, the Department notes that even though California has experienced extensive agricultural employment of undocumented foreign workers, an AEWR calculated in the traditional manner would still come to only 5% above the average wage in that state. *See id.* at 20,504. The Department's point is unclear. If it is saying there is no wage depression from past foreign workers, it must make that case forthrightly.[10] Inability to secure persuasive data as to any effects of past wage depression might indeed justify ending the enhancement or contribute to such a decision. But the example given by the Department could just as logically suggest that adjustments were needed, but in an upward direction rather than a total elimination. The Department simply does not explain why such variances justify the Department's total abandonment of its policy of enhancing AEWRs to compensate for past wage depressions rather than changes in methodology to assure more accurate estimates.[11] Thus, even if the Department does have a case for changing its premises about adverse wage effects on American workers, that case has yet to be made.

CONCLUSION

Agencies may not substantially alter regulatory policy without a reasoned explanation. The Department of Labor's new temporary alien agricultural labor certification program reverses a two decade-old, court-

9. The H–2A program covers all the states in the continental United States, not merely the original fourteen "user" states whose levels of foreign workers had prompted the Department to specify state-specific AEWRs.

10. Similarly, elsewhere in the Federal Register, the Department merely points to the fact that the H–2A program will cover "new growers in new crops in new States," 52 Fed.Reg. 20,496, 20,504 (1987). That statement alone, of course, throws no light on the issue of whether the past presence of undocumented workers has depressed the wages paid by these growers, in these crops, and in these states.

11. The district court erred by suggesting that the Department's draft AEWR regulations obliged the Department to reply to the methodology proposed therein; nevertheless, the fact that the final regulation's preamble recites the exact language of the draft preamble minus one point—the need for a differential to offset past wage depression—yet offers no explanation for the deletion, lends additional support to the need for a remand to obtain a satisfactory explanation of the change.

approved policy of enhancing wage compensation to benefit United States farmworkers. In abandoning that approach, the Department was required to justify its fundamental change of interpretation in its statutory mandate to protect American workers from the adverse effect of temporary foreign workers. We now remand to the Department of Labor for a reasoned explanation of that change.