**AFL–CIO, et al., Plaintiffs,**

v.

**Ann McLAUGHLIN, et al., Defendants,**

**and**

**National Council of Agricultural Employers, et al.,
Defendants–Intervenors,**

**and**

**American Farm Bureau Federation,
Defendant–Intervenor.**

**Civ. A. No. 87–1683.**

United States District Court,
District of Columbia.

Dec. 20, 1988.

Shelley Davis, Edward Tuddenham, Migrant Legal Action Program, Washington, D.C., Garry G. Geffert, West Virginia Legal Services, Martinsburg, W.Va., David Silberman, Associate Gen. Counsel, AFL–CIO, Washington, D.C., for plaintiffs.

John R. Bolton, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., Drake Cutini, U.S. Dept. of Justice, Washington, D.C., for Federal defendants.

John M. Simpson, Robert A. Burgoyne, Fulbright & Jaworski, Washington, D.C., for National Council of Agr. Employers.

Kathryn A. Oberly, Michael F. Rosenblum, Patricia A. McCoy, Mayer, Brown & Platt, Washington, D.C., for American Farm Bureau Federation.

## MEMORANDUM OPINION

SPORKIN, District Judge.

This is another chapter in a long saga of litigation. *See AFL–CIO v. Brock*, 835 F.2d 912 (D.C.Cir.1987), *remanding* 668 F.Supp. 31 (D.D.C.). The entire factual and procedural background of this action need not be fully recited here. However, a short review is in order.

## I. BACKGROUND

Plaintiffs in this case challenge regulations adopted by the United States Department of Labor ("Department" or "DOL") pursuant to the Immigration Reform and Control Act of 1986 ("IRCA"). 8 U.S.C. Sec. 1186(a)(1) (1982 & Supp. IV 1986). The relevant section of IRCA requires that, before the Attorney General approves a petition for importation of alien workers, the employer desiring to import aliens seek certification from the Secretary of Labor that:

(A) there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition, and

(B) the employment of the alien in such labor or services will not *adversely affect* the wages and working conditions of workers in the United States similarly employed.

*Id.* (emphasis added).[1]

In an attempt to fulfill this objective, i.e. offsetting the effects of wage depression due to the presence of alien farmworkers, the Department of Labor prohibited employers from paying workers below an "adverse effect wage rate" ("AEWR"). AEWRs were designed to approximate the wage rates that would have existed had there been no increase in the labor supply from foreign workers. Prior to 1987, the Department adhered to a methodology that produced wage enhancing AEWRs approximately 20 percent above the average farm wage as determined by the United States Department of Agriculture ("USDA"). *See AFL–CIO v. Brock*, 668 F.Supp. at 34–35 (citing Draft H–2A Regulations, March 13, 1987). However, following the passage of

---

1. Prior to the passage of IRCA, the Immigration and Nationality Act of 1952 ("INA"), as amended, 8 U.S.C. Sections 1101, *et seq.* (1982 & Supp. III 1985), vested authority to grant or deny a non-immigration visa petition with the Attorney General. *See id.* Sections 1101(a)(15)(H)(ii), 1184. Pursuant to this directive, the Attorney General promulgated a regulation requiring employers seeking foreign workers to secure certification from the Department of Labor that "qualified persons in the United States are not available ... and ... that the employment ... will not adversely affect the wages and working conditions of workers in the United States similarly employed." 8 C.F.R. Sec. 214.2(h)(3) (1986). In effect, IRCA codified this procedure. *See* 8 U.S.C. Sec. 1186(a)(1) (1982 & Supp. IV 1986).

IRCA, the Department adopted new AEWR regulations under which an employer was required to pay the higher of either (1) the actual hourly agricultural wage for each state as determined by the USDA,[2] (2) the prevailing wage, or (3) the federal or state minimum wage. 20 C.F.R. Sec. 655.-107 (April 1, 1988); 52 Fed.Reg. 20521 (June 1, 1987).

Under the new AEWRs, farm workers faced the prospect of wage cuts. *See AFL–CIO v. Brock*, 835 F.2d at 914, 917–19. In response, plaintiffs brought this action claiming that the new AEWR did not protect U.S. workers from the adverse effects of the presence (and past presence) of foreign workers in U.S. labor markets. Plaintiffs argued that the failure to provide such protection was contrary to law.

I reviewed the regulations in question and found, *inter alia*, that the new regulations "do[ ] nothing to protect American workers and thus [are] not in accordance with law." *Id.*, 668 F.Supp. at 40. Further, I found "the process by which the Department arrived at the present rules flawed by the absence of an appropriate explanation." *Id.*

DOL appealed the Opinion and Order of this court. The Court of Appeals, reviewing the case, held:

> Agencies may not substantially alter regulatory policy without a reasoned explanation. The Department of Labor's new temporary alien agricultural labor certification program reverses a two decade-old, court-approved policy of enhancing wage compensation to benefit United States farm workers. In abandoning that approach, the Department was required to justify its fundamental change of interpretation in its statutory mandate to protect American workers from the adverse effect of temporary foreign workers.

*Id.*, 835 F.2d at 919–20. Pursuant to that Opinion, I ordered the Department of La-

bor to issue a "reasoned explanation" for the actions it took in adopting its 1987 AEWR regulations. *Id.*, Civil Action No. 87–1683 (filed Mar. 25, 1988) ("Remand Order") [1988 WL 33056].

The Department now has submitted to this court an explanation of the new AEWR regulations. *See* Federal Defendants' Motion to Alter Remand Order and Memorandum in Support, attachment ("DOL Explanation"). Further, the Department has moved to alter the Remand Order to permit publication of the DOL Explanation in the Federal Register and to allow consideration of public comment. The plaintiffs oppose this motion and have filed a motion for summary judgment seeking a declaration that the June 1, 1987 AEWR regulation is invalid.

I must now determine whether the Department of Labor has provided the "reasoned explanation" ordered by this court and the Court of Appeals.

## II. DISCUSSION

The Remand Order was specific; the Department was required to "justify its fundamental change" and provide "a reasoned explanation of that change." *AFL–CIO v. Brock*, 835 F.2d at 919–20. To satisfy this Order, the Department was required to articulate the basis for its 1987 departure from its two-decade old AEWR policy. *See AT & T v. FCC*, 832 F.2d 1285, 1291 (D.C. Cir.1987); *Western Union International v. FCC*, 804 F.2d 1280, 1291 (D.C.Cir.1986); *see also Brae Corp. v. United States*, 740 F.2d 1023, 1038 (D.C.Cir.1984), *cert. denied*, 471 U.S. 1069, 105 S.Ct. 2149, 85 L.Ed.2d 505 (1985).

Upon review of the Department's Explanation, I find that defendants have failed to adhere to the Remand Order of this court and the Court of Appeals. Further, I find that the Department has failed to provide a reasoned explanation of its 1987 decision to alter the AEWR regulations.

---

**2.** This new methodology sets the AEWR at a level equal to the previous year's annual regional average hourly wage rates for field and livestock workers as computed by USDA. Thus, under DOL's new regulation, the USDA average

is the AEWR. *See* Federal Defendants' Motion to Alter Remand Order and Memorandum in Support, attachment ("DOL Explanation") at 8–9.

### A. DOL Has Failed To Adhere To the Remand Order and Engaged In Post–Hoc Rationalization

Rather than simply explaining the basis of its policy change, the Department, by its own admission, undertook to "extensively reexamine[ ] the issue." DOL Explanation at 25; *see also* Defendant's Motion to Alter Remand Order at 1 ("the explanation relies on a considerable amount of new data and information that was not relied upon previously"). This reexamination consists of a canvass of secondary source materials.[3] Over half of these materials were not in existence at the time of the initial rulemaking. Of the six studies relied upon by the Department, the three most frequently cited were published in 1988.[4]

It first must be stressed that this case was not remanded to the Department so it might reexamine its AEWR policy. The case was remanded to give the Department an opportunity to provide a "reasoned explanation" for its 1987 change in policy. The Remand Order did not call for a reexamination; it did not seek a *de novo* review. Rather, the Department was simply required to furnish a rational explanation for its actions. This the Department did not do.

Further, even if this case had been remanded for reconsideration or reexamination—which it was not—the Department has not explained how a reasoned explanation can be based on information not in existence until after the decision in question was made. The Department is either unwilling or unable to recognize that, when departing from past policy and course, "it is at least incumbent upon the agency carefully to spell out the bases of its decision. . . ." *Food Marketing Institute v. I.C.C.,* 587 F.2d 1285, 1290 (D.C.Cir.1978); *see also Brae Corp.,* 740 F.2d at 1038.

Moreover, when remanding a decision to an agency for a reasoned explanation, an agency is not permitted to engage in *post-hoc* rationalization. This is especially true when the agency seeks to alter extant policies. *See Western Union International,* 804 F.2d at 1291 ("[t]he key is whether the agency changed its policy only after reasoned consideration of relevant factors"). Indeed, the Court of Appeals has stated:

> To be sure, where . . . the remand merely requires the agency further to elaborate its reasoning, there is no requirement that the agency arrive at a different substantive result upon reconsideration. At the same time, we must recognize the danger that an agency, having reached a particular result, may become so committed to that result as to resist engaging in any genuine reconsideration of the issues. The agency's action on remand must be more than a barren exercise of supplying reasons to support a pre-ordained result. *Post-hoc* rationalizations by the agency on remand are no more permissible than are such arguments when raised by appellate counsel during judicial review.

*Food Marketing Institute,* 587 F.2d at 1290; *see also Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962); *Appeal of Bolden,* 848 F.2d 201, 207 (D.C.Cir. 1988); *accord Motor Vehicle Manufacturers Assoc. v. State Farm Mutual,* 463 U.S.

---

**3.** I cannot understand why the Department has insisted on relying on secondary sources of information and studies for formulating its AEWR policy and setting AEWRs. As discussed *infra* at 311–12, the Department itself has found these sources to be inconclusive on the issue of wage depression. Certainly, a proper first step in determining whether and to what extent wage depression need be compensated is conducting a comprehensive study of the scope and degree of such wage depression. Indeed, a recent report by the United States General Accounting Office ("GAO") raised questions about the reliability of some of the data upon which DOL has been basing its AEWR policy. *See The H–2A Program: Protections for U.S. Farmworkers* at 24, 35, 58, 66–67 (GAO/PEMD–89–3, Oct. 1988).

**4.** The three 1988 sources are:

(1) *Illegal Aliens: Influence of Illegal Workers on Wages and Working Conditions of Legal Workers* (GAO/PEMD–88–13BR, Mar.1988);
(2) *National Bureau of Economic Research Summary Report: Immigration, Trade, and the Labor Market* (January 20, 1988); (3) Dr. Phillip L. Martin, *IRCA and the U.S. Farm Labor Market* (Feb.1988).

DOL Explanation at 29, 33, 34 *passim.*

29, 50, 103 S.Ct. 2856, 2870, 77 L.Ed.2d 443 (1983).

In the present case, the Department changed a two-decade old policy and now attempts to explain the basis of that change by proffering studies and surveys not in existence when the change was made. It is incomprehensible to me how the Department can base an explanation of an action taken in the Spring of 1987 on information not even in existence until 1988. I, therefore, am constrained to find that DOL's "rel[iance] upon a considerable amount of new data and information not relied upon previously" constitutes a *post-hoc* rationalization. *See* Defendant's Motion to Alter Remand Order at 1; *see also* DOL Explanation at 2. Further, as indicated above, I find that defendants have failed to adhere to the Remand Order of this court and the Court of Appeals.

B. *DOL's Explanation Fails To Provide A Reasoned Explanation For the Actions DOL Took In Adopting It 1987 AEWR Regulation*

Even assuming, *arguendo*, that the Department's Explanation did not suffer from the defects discussed above, the Explanation, nonetheless, fails to provide a reasoned explanation for the action the Department took in adopting its 1987 AEWR regulations. 20 C.F.R. Sec. 655.107 (April 1, 1988); 52 Fed.Reg. 20496 (1987).

The Department advances two lines of reasoning in support of its action. First, the Department contends that the studies relied upon indicate that wage depression no longer exists or is so minimal or isolated that it is insignificant. *See* DOL Explanation at 27–37, 40. Second, the Department asserts that the USDA data series, which it proposes to use as the new AEWR, does not reflect wage depression and, therefore, need not be enhanced. *See id.* at 36–40. The DOL Explanation simply does not support these conclusions.

1. THE STUDIES CITED DO NOT SUPPORT A FINDING THAT WAGE DEPRESSION NO LONGER EXISTS

DOL's Explanation canvasses a number of surveys and studies that address wage depression in U.S. labor markets due to the presence of illegal alien workers. Upon review of this data, DOL states that it "views the data and literature as inconclusive on the issue of adverse effect or wage depression from the presence of illegal alien workers." DOL Explanation at 38. Further, DOL contends that "recent studies ... indicate that it is highly questionable as to whether and how much adverse effect has occurred from the use of illegal aliens." *Id.* at 40.

Despite DOL's conclusions, the majority of the studies cited in the DOL Explanation indicate that instances of wage depression do exist. For example, the *Economic Report of the President* states that "[s]ome studies of the effects of immigration on wage levels have revealed evidence of adverse wage effects." DOL Explanation at 28 (citing *Economic Report of the President* 221–34 (1986)). A United States General Accounting Office ("GAO") survey comments that "in some cases, [illegal aliens do] exert a downward pressure on wages and working conditions within low-wage, low-skilled jobs in certain labor markets." *Id.* at 29 (quoting *Illegal Aliens: Influence of Illegal Workers on Wages and Working Conditions of Legal Workers*, (GAO/PEMD–88–13) (March 1988)). Further, the National Commission for Employment Policy found "undocumented workers do displace some native-born U.S. workers and do lower wages and working conditions in some occupations and geographical areas." *Id.* at 32 (quoting *Illegal Immigrants and Refugees—Their Economic Adaption and Impact on Local U.S. Labor Markets: A Review of the Literature* (Oct.1986)).

These are the very surveys and studies DOL relies on in concluding that the existence of wage depression is insignificant. The data offered by DOL clearly indicates that instances of wage depression do exist.[5]

5. The Department admits that much of the evidence is inconclusive. *See, e.g.,* DOL Explanation at 32 (quoting a report which finds that

"the evidence is not conclusive regarding the overall or aggregate effects on the labor market"). DOL has failed to provide a single study

The Department has, on this inconclusive record, abruptly overridden a two-decade old system that DOL itself admits has been effective in carrying out a congressionally mandated policy. I cannot understand how the Department can argue these inconclusive studies provide sufficient support to override the use of a wage enhancing AEWR. *See Western Union International*, 804 F.2d at 1291; *Brae Corp.*, 740 F.2d at 1038 ("agency must explain why the original reasons for adopting a rule or policy are no longer dispositive"), *cert. denied*, 471 U.S. 1069, 105 S.Ct. 2149, 85 L.Ed.2d 505 (1985). Therefore, I find that the Department has failed to demonstrate that the conditions of wages, i.e. the absence of wage depression, is such that a wage enhancing AEWR is no longer required.[6]

## 2. DOL HAS FAILED TO SUPPORT ITS CONTENTION THAT THE USDA WAGE SURVEY DOES NOT REFLECT WAGE DEPRESSION

The Department argues that setting AEWRs at the level of actual average hourly agricultural wages for each state as determined by the USDA serves to protect workers from the adverse effects of wage depression. Basically, DOL claims that the USDA wage rates "have not been affected significantly by the presumably lower wages paid to illegals...." DOL Explanation at 37; *see also id.* at 8–9. Therefore, according to DOL, the USDA wage rates are suitable AEWRs that provide sufficient protection for U.S. workers.

Specifically, the DOL Explanation quotes a GAO study that states:

wage depression is harder and harder to detect at levels of analysis beyond or above a highly localized and occupation-specific labor market. For example, we found evidence of displacement of legal citrus pickers by illegal ones in Ventura County, California, but those effects probably would not be evident in data on agricultural workers in central California generally and even less so at higher levels of aggregation such as unskilled workers in the state. Thus, case studies that concentrate on specific industries or sectors in labor markets in specific communities may be better able to detect wage depression then aggregate data.

*Id.* at 37 (quoting *Illegal Aliens: Influence of Illegal Workers on Wages and Working Conditions of Legal Workers* (GAO/PEMD–88–13BR, March 1988)). The Department argues that this statement indicates that the USDA survey is not affected by wage depression.

I cannot accept DOL's interpretation of the above quoted language. It simply is not clear that the interpretation urged by DOL is correct. In contrast to DOL's reading, I understand the excerpt to mean that wage depression exists but the extent and pervasiveness of such wage depression cannot be determined by looking at the USDA aggregate. Indeed, the GAO in a recent

---

which concludes that the presence of illegal alien workers has not had an adverse effect on U.S. labor markets. The only study cited that comes close to such a conclusion states that "[t]he evidence of these possible wage-depressing effects of illegals is sparse." DOL Explanation at 35 (citing Martin, *supra* note 4). How DOL has come to conclude that this record supports the elimination of a two decade-old wage enhancing AEWR is not explained.

Moreover, DOL has failed to consider alternatives to an abrupt reversal of its past policies. *See AFL–CIO v. Brock*, 835 F.2d at 918 n. 7 (citing *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C.Cir.1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971)).

**6.** At a hearing held on September 28, 1988, the Department argued that an inconclusive finding

supports its decision to abandon a wage enhancing AEWR. The Department suggested that the Court of Appeals, in its *AFL–CIO v. Brock* decision, had reached just such a conclusion. Transcript at 14–15. However, the interpretation posited by the Department takes the Court of Appeals' statement out of context. The Court of Appeals stated:

If [the Department] is saying there is no wage depression from past foreign workers, it must make the case forthrightly. Inability to secure persuasive data as to any effects of past wage depression might indeed justify ending the enhancement or contribute to such a decision. But the example given by the Department could just as logically suggest that adjustments were needed, but in an upward direction rather than total elimination.

835 F.2d at 919 (emphasis added & footnote omitted).

report came to just such a conclusion. The GAO report states:

> *For purposes of setting the [AEWR], the USDA survey* —although generally conforming to accepted survey practices—*provides estimates of largely unexamined precision,* which have a more questionable reliability for some regions of the country than for others. The prevailing wage surveys vary considerably in procedures and quality, perhaps due to DOL's minimal oversight and lack of adequate quality control....

*The H-2A Program: Protections for U.S. Farmworkers* 66 (GAO/PEMD-89-3, Oct. 1988) (emphasis added).

Further, I am troubled by the Department's eagerness to find that the USDA wage survey does not reflect instances of wage depression and, therefore, is a sufficient AEWR. This conclusion is supported by the most minimal evidence.[7] I cannot understand how, given the sparsity of evidence, the Department can reasonably conclude that the USDA survey adequately protects U.S. workers from the adverse effects of wage depression.

## III. CONCLUSION

For two-decades, by the simple technique of applying a twenty percent enhancement to the average farm wage, the Department has carried out the congressionally mandated policy that alien workers only be hired where doing so would not adversely effect the wage rate of U.S. workers. By adopting its new AEWR, which eliminates the enhancement and merely requires that alien workers be paid the USDA average wage, DOL is in effect saying that a non-enhanced wage can effectuate the desired objective of protecting U.S. workers. That may well be so. But, thus far, the Depart-

ment has failed to offer a reasonable explanation how U.S. workers are protected under its new program.

The new AEWRs have now been in effect for over eighteen months. Data should be available to demonstrate the effectiveness of DOL's enhancement-free AEWR. If DOL persists in its position that a wage enhancing AEWR is no longer required, I am certain this data will be available for a new rulemaking proceeding to demonstrate whether DOL's position is correct.[8]

Thus far, the Department has had two opportunities to provide a reasonable explanation of its actions. In each of these instances, the Department has been unable or unwilling to provide such an explanation and has attempted to explain a change in a two-decade old policy by offering data that is, at best, concededly inconclusive. The Department has failed to provide a reasoned rationale for the new methodology it chose to adopt. I therefore find that it would be futile to again remand this case to the Department.

Based on all of the foregoing reasons, I find that DOL has failed to provide a reasoned explanation for its actions in adopting its 1987 adverse effect wage rate regulations and, therefore, DOL's AEWR regulations are contrary to law. 20 C.F.R. Sec. 655.107 (April 1, 1988). Accordingly, the Department of Labor shall be enjoined from implementing the new AEWR it adopted in 1987.

An appropriate Order accompanies this opinion.

## ORDER

On this date, the Court issued its opinion in the above titled action. In accordance with the reasons set forth therein, it is

---

**7.** In addition to the quoted GAO Report, DOL again points to a single study conducted by Dr. Phillip L. Martin. *See* Martin, *supra* note 4. Dr. Martin's study states that "wage increases traceable to the removal of illegal alien workers *may not* be apparent in regularly-published wage data...." DOL Explanation at 36 (emphasis added). This is the most forceful support DOL has provided for its abrupt reversal of policy. Further, in light of GAO's most recent report on the accuracy of the USDA wage rate, I am compelled to question the accuracy of DOL's

contention. *See generally The H-2A Program: Protections for U.S. Farmworkers.*

**8.** The Department is always free to reconsider these matters through a new proposed rulemaking. *See* 5 U.S.C. Sec. 553. Indeed, such a course of action, in conjunction with an objective, comprehensive study of the existence and effects of wage depression, may well serve the best interests of all parties to this action.

ORDERED that Defendant's Motion to Alter Remand shall be and hereby is denied and that Plaintiff's Motion for Partial Summary Judgment shall be and hereby is granted; and it is further

DECLARED that the regulations published at 20 C.F.R. 655.107 (April 1, 1988) as set forth in 52 Fed.Reg. 20521 (June 1, 1987) are contrary to law; and it is

FURTHER ORDERED that the defendants shall be enjoined from implementing these regulations from this day on; and it is

FURTHER ORDERED that the defendants shall be enjoined from implementing these regulations from this day on; and it is

FURTHER ORDERED that any new regulations promulgated by the Secretary of Labor to replace the regulations herein declared contrary to law shall effectuate and be consistent with the statutory requirements set forth at 8 U.S.C. Sec. 1186(a)(1)(B) and with the accompanying Opinion.