**AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS (AFL–CIO), et al.**

v.

**Elizabeth H. DOLE, Secretary of Labor, et al., National Council of Agricultural Employers, et al., Appellants.**

Nos. 89–5001, 89–5012.

United States Court of Appeals, District of Columbia Circuit.

Argued March 10, 1989.

Decided Aug. 29, 1989.

**598**

John S. Koppel, Atty., U.S. Dept. of Justice, with whom John R. Bolton, Asst. Atty. Gen. at the time the brief was filed, Jay B. Stephens, U.S. Atty., and Harry L. Sheinfeld, Counsel for Litigation, U.S. Dept. of Labor, Washington, D.C., were on the brief, for federal appellants/appellees. Michael J. Singer, Atty., U.S. Dept. of Justice, Washington, D.C., also entered an appearance for appellees in No. 89–5001.

John M. Simpson, with whom Kathryn A. Oberly, Washington, D.C., Michael F. Rosenblum, Chicago, Ill., Patricia A. McCoy, and Robert A. Burgoyne, Washington, D.C., were on the brief, for appellants Nat. Council of Agr. Employers, et al.

Edward J. Tuddenham, Austin, Tex., with whom Shelley Davis, New York City, Garry G. Geffert, and David Silberman, Washington, D.C., were on the brief, for appellees AFL–CIO.

Before WALD, Chief Judge, and BUCKLEY and SENTELLE, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

The Department of Labor and the National Council of Agricultural Employers challenge district court orders enjoining the Department from implementing a new regulation governing the compensation of alien agricultural workers hired on a piece-work basis. The orders were based on a ruling that the Department had not provided a reasoned explanation for what the court deemed to be a departure from prior policy. We conclude that the regulation is consistent with past policy and that the reasons for its promulgation are adequately explained. Therefore, we reverse.

## I. BACKGROUND

The Immigration and Nationality Act of 1952 as amended, 8 U.S.C. §§ 1101 *et seq.* (1982 & Supp. V 1987) ("Act"), authorizes the Attorney General to approve an employer's petition to import alien workers if the petitioner receives certification from the Secretary of Labor ("Secretary") that

(A) there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition, and

(B) the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed.

8 U.S.C.A. § 1188(a)(1) (1989 Supp.) (redesignating 8 U.S.C. § 1186).

To protect domestic employees against the wage depression attributed to the importation of foreign workers, the Department of Labor ("DOL" or "Department") has for many years regulated the wages paid by employers hiring alien labor. With respect to farmworkers paid by the hour, the DOL has prohibited affected employers from paying less than the "adverse effect wage rate" ("AEWR") established by the Department. The Department has also used various techniques to protect workers paid by the piece, e.g., by the bushel of apples picked.

On June 1, 1987, the DOL adopted an interim final rule that set new procedures for calculating the AEWR and for protecting piece-rate employees. The AFL–CIO and other interested parties successfully challenged the new regulations in the dis-

trict court. *See AFL–CIO v. McLaughlin,* 702 F.Supp. 307 (D.D.C.1988) (dealing with AEWR issue); *AFL–CIO v. McLaughlin,* 702 F.Supp. 314 (D.D.C.1988) (dealing with piece-rate regulation) ("Mem. Op."). Appellants initially asked us to review the district court's ruling on both the AEWR and piece-rate issues. As the Department has recently published a final AEWR regulation that replaces the interim rule, *see* 54 Fed.Reg. 28,037 (1989), we have dismissed the case challenging that rule as moot. *AFL–CIO v. Dole,* No. 89–5011, —— WL —— (D.C.Cir. Aug. 9, 1989) (order dismissing case as moot). Thus, we only review the district court's piece-rate decision.

The new piece-rate regulation provides:

(A) If the worker will be paid on a piece rate basis and the piece rate does not result at the end of the pay period in average hourly piece rate earnings during the pay period at least equal to the amount the worker would have earned had the worker been paid at the appropriate hourly rate, the worker's pay shall be supplemented at that time so that the worker's earnings are at least as much as the worker would have earned during the pay period if the worker had been paid at the appropriate hourly wage rate for each hour worked; and the piece rate shall be no less than the piece rate prevailing for the activity in the area of intended employment; and

(B) If the employer who pays by the piece rate requires one or more minimum productivity standards of workers as a condition of job retention.

(*1*) Such standards shall be specified in the job offer and be no more than those required by the employer in 1977, unless [the DOL] approves a higher minimum; or

(*2*) If the employer first applied for ... temporary alien agricultural labor certification after 1977, such standards shall be no more than those normally required (at the time of the first application) by other employers for the activity in the area of intended employment, un-

less [the DOL] approves a higher minimum.

20 C.F.R. § 655.102(b)(9)(ii) (1988).

The district court held that this rule was contrary to law because the Department had failed to provide

any explanation for why it now has chosen to abandon [its past policy] and adopt its new system. Nor has DOL explained how its new system will protect U.S. piece rate workers from the adverse effects of the importation of alien workers.

702 F.Supp. at 318.

Specifically, the court noted that although the Department's new regulation provides that piece-rate workers must receive no less than what they would have earned as hourly employees under the AEWR, the new regulation abandons two provisions that had previously had the effect of enhancing wages of *all* piece-rate workers. *Id.* at 317–18. First, prior regulations had included a "designed to yield" provision that required employers to design their piece rates so that their average employee's hourly earnings would at least equal the AEWR hourly wage. (Below average workers were protected by the requirement that employers pay them the difference between their piece-rate earnings and what they would have earned had they been employed by the hour at the AEWR.) 20 C.F.R. § 655.202(b)(9)(ii) (1987). Second, earlier regulations had included a "proportional increase" provision which, as applied, required employers to increase their piece rates in proportion to any increase in the AEWR. *Id.* § 655.207(c). By way of contrast, the new rule does not require employers to revise their piece rates in response to changes in the AEWR. Instead, it merely requires that piece-rate workers earning less than the AEWR receive make-up payments representing the difference between the two.

In a supplemental opinion and order issued January 5, 1989, the district court ruled that a remand for further explanation of the piece-rate rule would be fruitless and, with certain exceptions, permanently enjoined the regulation's implementation. The court issued a clarifying order on January 17, 1989.

## II. Discussion

The principal issue facing us is whether the district court correctly held that the Department's new regulation represented an unexplained departure from its past piece-rate policy. *See* 702 F.Supp. at 317.

As mentioned previously, the DOL's prior piece-rate regulations included two provisions, the "designed to yield" and "proportional increase" requirements, that have been eliminated from the new rule. The "designed to yield" requirement appeared as part of the provision assuring piece-rate workers of minimum earnings equivalent to the AEWR:

> [T]he piece rate will be designed to produce average hourly earnings at least equal to the [AEWR]. If the piece rate does not result at the end of the pay period in average hourly earnings during the pay period at least equal to the amount the worker would have earned had the worker been paid at the adverse effect rate, the worker's pay will be supplemented at that time so that the worker's earnings are at least as much as the worker would have earned during the pay period if the worker had been paid at the adverse effect rate.

20 C.F.R. § 655.202(b)(9)(ii) (1987) (emphasis added). The proportional increase requirement, as set forth in the prior regulation, provided:

> In any year in which the applicable adverse effect rate increases to the point where the employer's previous year's piece rate in a crop activity will not enable the average U.S. worker's hourly earnings to equal or exceed the new applicable adverse effect rate without requiring the average U.S. worker to increase productivity over the previous year, the employer shall increase the piece rate to a level at which the average U.S. worker would earn at least the adverse effect rate.

*Id.* § 655.207(c).

Historically, the Department did not interpret its proportional increase provisions as requiring an increase in a piece rate each time the AEWR was raised so long as the employer's *average* worker continued to earn the AEWR. *See* 52 Fed.Reg. at 11,461 (1987). In *NAACP v. Donovan,* 558 F.Supp. 218, 222 (D.D.C.1982), however, the district court held that the provision required that employers increase piece rates in proportion with each increase in the AEWR. Since 1982, therefore, the two rates have increased in lockstep. As a consequence, all piece-rate workers, including those earning well above the AEWR, were assured of increased earnings each time the adverse effect rate was raised.

In its explanation for the new piece-rate rule, which relies solely on make-up payments to ensure that piece-rate workers receive at least the AEWR, the agency justified dropping the designed to yield and proportional increase requirements because of problems that had been encountered with their application. The DOL noted, for example, that the designed to yield provision was "vague, imprecise, and unclear, both conceptually and operationally." 52 Fed.Reg. 11,460, 11,464 (1987). Weaknesses associated with its implementation included:

> (1) The resource problems inherent in the examination of grower payroll records; (2) the problems that arise when new States and crops where no adequate payroll records exist enter the program; and (3) the unsurmountable [sic] problem of being unable to factor into the process considerations affecting past years actual earnings which are beyond the control of the employer, such as weather, crop yield and physical capability of workers.

*Id.* at 11,463 (1987).

Similarly, the Department determined that the proportional increase provision resulted in inequities between growers due to productivity differences, thwarted justifiable productivity increases, discouraged management initiatives to improve productivity, and proved difficult to apply to new crops and new states. *See* 51 Fed.Reg. 20,516, 20,519–20 (1986) (proposing new

piece-rate rule). The DOL also found that the prior rule undermined the use of piece rates as a legitimate management tool and might eventually lead to the abandonment of piece-rate employment. *Id.* at 20,520.

The district court found the Department's new regulation to be a departure from earlier policy because

> [i]n the past, piece rate workers have been protected by an enhanced wage produced by both the "designed to yield" provision and proportional increases. In abandoning its former policy, in which all piece rate workers received this enhanced wage, DOL has seemingly abandoned those farmworkers who are paid through the piece rate and who exceed the AEWR floor.

702 F.Supp. at 318. The court defined that former policy "as enhanc[ing] the wages of *all workers* paid by piece rate." *Id.* at 317 (emphasis in original). The Department objects to this characterization and asserts that it has consistently relied on the use of the AEWR as a wage floor to ensure that domestic workers are not "adversely affected" by alien competition:

> [U]nder the [Act], it is clear that the use of foreign workers to a certain degree is intended so long as certain minimum protections are provided to U.S. Workers, and the AEWR is the primary device for providing the protection from adverse effect. The provision in the regulations that make-up pay to the AEWR be provided is maintained to reflect DOL's continuation of past policy relying on the AEWR as the minimum protective floor.

52 Fed.Reg. at 11,464. In its brief, the DOL insists that although one effect of its prior regulation (as interpreted by the district court in *NAACP v. Donovan* in 1982) has been to enhance piece rates for all workers each time the AEWR was increased, this was no more than the incidental result of a policy designed to place a floor under piece-rate workers' earnings. To determine the validity of this position, we must examine the history of these now-abandoned provisions.

## A. Designed to Yield Provision

The Department's designed to yield requirement originated in the 1950's under the "Bracero Program," which governed the admission of Mexican citizens into the United States for temporary agricultural employment from 1951 to 1964. *See* Act of July 12, 1951, Pub.L. No. 78, ch. 223, 65 Stat. 119. As a condition for permitting the importation of Mexican nationals under the program, the Secretary of Labor was required to certify that their employment would not "adversely affect" the wages of domestic workers similarly employed. 65 Stat. at 120. In 1958, the Department adopted a policy requiring that employers pay Mexican nationals not less than fifty cents per hour or, if they were paid piece rates,

> [a]s a condition of authorization to employ Mexican nationals on activities compensated on a piece-rate basis, employers will be expected to establish piece rates at levels which will produce to contracted Mexican workers of normal competence who apply themselves diligently earnings averaging not less than 50 cents per hour.

U.S. Department of Labor, Bureau of Employment Security, Employment Service Program Letter No. 885 (May 21, 1958); *see generally* Dellon, *Foreign Agricultural Workers and the Prevention of Adverse Effect,* 17 Labor L.J. 739, 741 (1966).

At the time, the DOL explained that its objective in establishing this "designed to yield" provision was to ensure piece rates that would permit earnings generally commensurate with the fifty-cent hourly minimum established for Mexican workers while preserving the incentives that can make piece-rate employment beneficial for both employers and employees:

> [T]he Department of Labor has adopted a policy which requires the establishment of piece rates at levels which will afford to Mexican workers of normal competence who apply themselves diligently the opportunity to average not less than 50 cents per hour. The policy does not

provide for the payment of a minimum wage. No individual worker is guaranteed 50 cents per hour by this policy. He will earn more if he works more diligently; he will earn less if he slows down or loafs on the job. The incentive aspect of the piece rate system is unchanged.

U.S. Department of Labor, Bureau of Employment Security, Employment Service Program Letter No. 916 (Aug. 15, 1958). There is nothing in the Program Letter to suggest a collateral objective of raising the earnings of *all* piece rate workers.

When the Bracero Program expired in December 1964, the Department issued its first regulations governing the importation of alien workers under the Immigration and Nationality Act. *See* 29 Fed.Reg. 19,-101, 19,102 (1964). In a variation on its Bracero formulation, the new regulation provided that

> [p]iece rates shall be designed to produce hourly earnings at least equivalent to the prescribed hourly rates and in no event shall the worker be paid less than the prescribed hourly rate.

*Id.* The explanatory statement accompanying the regulation made no mention of the Department's reasons for including the designed to yield provision. Because the provision required the establishment of piece rates that would be applicable to efficient as well as inefficient workers, there is no doubt that it would have the incidental *effect* of enhancing the earnings of all piece-rate employees each time the basic rate was increased. Nevertheless, it cannot be said, on the record before us, that such an enhancement was the provision's *purpose.*

## B. Proportional Increase Provision

In its statement accompanying the new piece rate rule, the DOL asserts that it "has traditionally been concerned about situations where employers require increasing productivity in piece-rate-paid occupations in order to achieve a given hourly wage standard," 52 Fed.Reg. at 11,461, and that the purpose of the proportional increase provision was to prevent employers from responding to increases in the AEWR by increasing the productivity levels required of employees. *Id.* at 11,461–62.

This explanation finds support in the provision's history. In 1978, when the DOL first instituted the proportional increase provision, it provided the following comment:

> Worker representatives supported the proposal [for the proportional increase provision] in principle, charging that, when the adverse effect rate goes up, employers, instead of raising the piece rate, often simply require their workers to work faster. They testified that, although the adverse effect has gone up over the last several years, many employers had not altered their piece rates during that period.
>
> The Department recognizes the difficulty, as pointed out by employers, of measuring the productivity of average U.S. workers, especially in light of different crops and types of harvesting. The Department also recognizes the possibility of abuses, as pointed out by worker representatives. The Department, therefore, has decided to continue past policy by requiring that piece rates be designed to produce earnings equal to that produced by the adverse effect rate. The policy, however, has been clarified and adjusted to require that, in any year in which the adverse effect rate increases, employers must redesign their piece rates accordingly.

43 Fed.Reg. 10,306, 10,309–10 (1978). This contemporaneous explanation is consistent with the Department's claim that the provision was designed to prevent employers from increasing productivity requirements as a means of adjusting to an increase in the AEWR. It is also consistent with the view earlier expressed by the district court in *NAACP v. Donovan:* "This provision clearly aims at preventing growers from raising productivity rates rather than piece rates whenever the [AEWR] increases." 558 F.Supp. at 222.

We conclude that the agency did not depart from its past policy when it eliminated the proportional increase requirement. In fact, the new piece-rate regulation maintains the agency's policy of guarding against productivity increases by freezing productivity rates essentially at 1977 levels. 20 C.F.R. § 655.102(b)(9)(ii)(B) (1988).

### III. CONCLUSION

The district court set aside the piece-rate regulation on a finding that the Department had failed to explain why it had "abandoned" its past policy, or adopted its new rule, or how that rule would protect domestic piece-rate workers against the adverse effects of imported labor. We reject each of these conclusions. First, the DOL was under no obligation to explain its departure from a policy it had never adopted. Second, the Department has adequately explained its reasons for dropping requirements it had found difficult to apply, uncertain in their effects, and a threat to the continued use of the piece-rate system in agricultural employment. Finally, the new rule's guarantee that all piece-rate workers earn at least the AEWR conforms both with the DOL's past practice and the Act's requirement that domestic workers be protected from the adverse effect of alien labor. Accordingly, we reverse.

*So ordered.*